Citation Nr: 1542434 
Decision Date: 09/30/15 Archive Date: 10/05/15

DOCKET NO. 07-22 953 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Phoenix, Arizona


THE ISSUE

1. Entitlement to an initial rating in excess of 10 percent from July 26, 2005, to November 29, 2010, and an initial rating in excess of 30 percent from February 1, 2012 to October 6, 2014, and from December 1, 2015 to the present for a left knee disability. 

2. Whether a rating reduction from 50 percent to 30 percent effective February 1, 2015, for residuals of a hysterectomy was proper. 
 
3. Entitlement to an evaluation in excess of 50 percent prior to February 1, 2015, and in excess of 30 percent from February 1, 2015 to the present, for residuals of a hysterectomy.

4. Entitlement to an initial evaluation in excess of 50 percent for depressive disorder with posttraumatic stress disorder.

5. Entitlement to an evaluation in excess of 20 percent for degenerative disc disease of the lumbar spine.

(The matters of service connection for a cervical spine disability, service connection for a fatigue disability, and service connection for actinic keratosis are the subject of a concurrently but separately issued Board decision.)


REPRESENTATION

The Veteran represented by: Mark R. Lippman, attorney


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

Russell Veldenz, Counsel


INTRODUCTION

The Veteran served on active duty from May 2008 to July 1998.

This matter is before the Board of Veterans' Appeals (Board) on appeal of a June 2007 rating decision by the Phoenix, Arizona Department of Veterans Affairs (VA) Regional Office (RO).

In December 2009, the Veteran appeared at a hearing before the undersigned Veterans Law Judge. A transcript of the hearing is in the record. 

In July 2010, the Board remanded the case to the RO for additional development. As the requested development has been completed, no further action is necessary to comply with the Board's remand directives. Stegall v. West, 11 Vet. App. 268, 271 (1998).

The appeal of the Veteran originally included a claim for total disability based upon individual unemployability (TDIU). In a rating decision dated in January 2015, the RO granted TDIU effective the date the Veteran last worked. This is considered a full grant of the benefit sought on the appeal for the claim for TDIU. Holland v. Gober, 10 Vet. App. 433, 436 (1997). 

The issue of service connection for fibromyalgia has been raised by the record in a July 2014 document, but has not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over it, and it is referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2014). 

The issues of an increased rating for a lumbar spine disability, an increased rating for her mental health disability, and the propriety of a reduction in the rating for residuals of a hysterectomy are addressed in the REMAND portion of the decision below and is REMANDED to the AOJ

FINDINGS OF FACT

1. For the period from July 26, 2005, to November 29, 2010, the Veteran's left knee disability is manifested by, at worst, flexion to no less than 90 degrees and extension to 0 degrees with pain, loss of motion. And weakness; no additional functional loss due to pain, painful motion, weakness, excess fatigability, incoordination, swelling, atrophy, or additional loss of motion associated with flare ups or on repetitive use and without objective evidence of instability, laxity. 

2. For the periods from February 1, 2012 to October 6, 2014 and from December 1, 2015 to the present, the Veteran's residuals for a left knee total knee replacement has been manifested by intermediate degrees of pain and limitation of motion and function in such areas as walking, use of stairs, and sitting.

CONCLUSION OF LAW

1. For the periods from July 26, 2005, to November 29, 2010, the criteria for an evaluation higher than 10 percent, for arthritis of the left knee have not been met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2002 & Supp. 2014); 38 C.F.R. §§ 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5055, 5260, 5261 (2014).

2. For the periods from February 1, 2012 to October 6, 2014 and from December 1, 2015 to the present, the criteria for an evaluation higher than 30 percent, for residuals of a total knee arthroplasty and degenerative joint disease of the left knee have not been met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2002 & Supp. 2014); 38 C.F.R. §§ 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5055, 5260, 5261 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA, codified in part at 38 U.S.C.A. §§ 5103, 5103A, and implemented in part at 38 C.F.R § 3.159, amended VA's duties to notify and to assist a claimant in developing information and evidence necessary to substantiate the claims. 

Duty to Notify

Under 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b), when VA receives a complete or substantially complete application for benefits, it will notify the claimant of the following: (1) any information and medical or lay evidence that is necessary to substantiate the claim, (2) what portion of the information and evidence VA will obtain, and (3) what portion of the information and evidence the claimant is to provide. 

Where, as here, the appeal stems from notice of disagreement with the award of an initial disability rating following the grant of service connection, further VCAA notice is not required. 38 C.F.R. 3.159(b)(3). Rather, the Veteran's appeal as to the initial rating assignment triggers VA statutory duties under 38 U.S.C.A. § 5104 and § 7105. In this regard, a statement of the case was issued in November 2009 which set forth the diagnostic code criteria to be satisfied to warrant a higher initial rating for her left knee disability.

Duty to Assist

Under 38 U.S.C.A. § 5103A, VA must make reasonable efforts to assist the claimant in obtaining evidence necessary to substantiate the claim. The RO has obtained service treatment records, VA records, records from private medical caregivers, and afforded the Veteran a VA examinations in May 2011 and August 2012 and a hearing before the undersigned in December 2009. 

The report of the VA examination included a review of the Veteran's medical history, including his service treatment records, an interview and an examination of the Veteran, as well as sufficient findings to rate disability. Therefore, the Board concludes that the VA examinations are adequate. 38 C.F.R. § 4.2; see Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (holding that when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate).

In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the United States Court of Appeals for Veterans Claims (Court) held that 38 C.F.R. § 3.103(c)(2) requires that the Veterans Law Judge who conducts a hearing fulfill two duties to comply with the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. Here, during the Board hearing, the Veteran was assisted at the hearing by an accredited representative from the Disabled American Veterans, who then represented her on the claim for a higher rating for the left knee disability. The undersigned Veterans Law Judge (VLJ) identified the issues and asked the Veteran to provide details of who he has seen for his disabilities and when, including the most recent visits. The VLJ also asked the Veteran to clarify at which VA treatment occurred or whether any private physicians were involved. As to the left knee, she was asked specifically about what symptoms she noticed and their level of severity.
The hearing focused on the elements necessary to substantiate the claims, and the Veteran, through her testimony, demonstrated that she had actual knowledge of the elements necessary to substantiate her claim for a higher rating for the left knee disability. Therefore, the Board finds that, consistent with Bryant, the VLJ complied with the duties set forth in 38 C.F.R. § 3.103(c)(2), or to the extent the VLJ did not expressly state the elements of the criteria that were lacking to substantiate the claims, such error is harmless as both the Veteran and her representative also demonstrated actual knowledge of what was needed to prove the claim.

As the Veteran has not identified any additional evidence pertinent to the claim and as there are no additional records to obtain, the Board concludes that no further assistance to the Veteran in developing the facts pertinent to the claims is required to comply with the duty to assist. 

General Principles

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. Separate Diagnostic Codes identify the various disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1.

VA has a duty to acknowledge and consider all regulations that are potentially applicable through the assertions and issues raised in the record, and to explain the reasons and bases for its conclusions. Schafrath v. Derwinski, 1 Vet. App. 589, 592-93 (1991). 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. 
The Board will consider whether separate ratings may be assigned for separate periods of time based on facts found, a practice known as "staged ratings." Fenderson v. West, 12 Vet. App. 119, 126-27 (1999); Hart v. Mansfield, 21 Vet. App. 505, 519 (2007).

Rating factors for a disability of the musculoskeletal system included functional loss due to pain supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion, weakened movement, excess fatigability, swelling and pain on movement. 38 C.F.R. §§ 4.40, 4.45; DeLuca v. Brown, 8 Vet. App. 202, 206-07 (1995). Also with any form of arthritis, painful motion is factor to be considered. 38 C.F.R. § 4.59.

Prior to her total left knee joint replacement, the Veteran's left knee disability was rated as arthritis under Diagnostic Codes 5010 (arthritis) and 5260 (limitation of flexion). The Veteran's left knee disability is currently rated 30 percent under Diagnostic Code 5262 for her left knee joint replacement (left knee arthroplasty). The Board notes that she had the left knee replacement in November 2010 with a revision occurring in October 2014. VA has awarded the Veteran temporary total disability for convalescence, see 38 C.F.R. § 4.30, and the periods of convalescence have been excluded from the Board's analysis. On addition, the Board has stated the Veteran's claim as set forth on the first page of the decision.

Limitation of motion of the knee is rated under either Diagnostic Code 5260 (limitation of flexion) or Diagnostic Code 5261 (limitation of extension). A separate rating may be assigned for each, that is, for limitation of flexion and for limitation of extension. 

Under Diagnostic Code 5260, flexion limited to 60 degrees is zero percent disabling, flexion limited to 45 degrees is 10 percent disabling, flexion limited to 30 degrees is 20 percent disabling, and flexion limited to 15 degrees is 30 percent disabling. 

Under Diagnostic Code 5261, extension limited to 5 degrees is zero percent disabling, extension limited to 10 degrees is 10 percent disabling, extension limited to 15 degrees is 20 percent disabling, extension limited to 20 degrees is 30 percent disabling and extension limited to 30 degrees is 40 percent disabling.

Normal range of motion of the knee motion is from zero degrees of extension to 140 degrees of flexion. 38 C.F.R. § 4.71 , Plate II.

Also for consideration is Diagnostic Code 5257 for instability. A separate rating may also be assigned for instability of the knee under Diagnostic Code 5257. Esteban v. Brown, 6 Vet. App. 259, 261 (1994) (laxity and loss of motion are separate and distinct disabilities). Under Diagnostic Code 5257, the criteria for 10 percent rating is either slight recurrent subluxation or slight lateral instability. Moderate recurrent subluxation or moderate lateral instability is rated 20 percent disabling. Severe recurrent subluxation or severe lateral instability is rated 30 percent.

As the medical evidence indicates the Veteran had meniscus damage in her left knee, the Board notes that under Diagnostic Code 5259, a 10 percent rating is assigned for surgical removal of a semilunar cartilage that is symptomatic. If the meniscus was not removed, a rating under Diagnostic Code 5258 for dislocated semilunar cartilage allows for maximum rating of 20 percent.

As noted above, the Veteran has a left knee arthroplasty, which is a prosthetic implant that is rated under 38 C.F.R. § 4.71a , Diagnostic Code 5055. After the one year convalescence period, if there are chronic residuals consisting of severe painful motion or weakness in the affected extremity, the rating is 60 percent. The minimum rating after a knee replacement is 30 percent. In addition, Diagnostic Code 5055 also allows for a higher rating by analogy to Diagnostic Codes 5260, 5261, as discussed above, and 5262. Diagnostic Code 5262, impairment of the tibia and fibula, provides a 40 percent rating for nonunion of the tibia and fibula with loose motion, requiring a brace.




Facts

In October 2004, the Veteran underwent arthroscopic surgery on her left knee for tears of both the medial and the lateral meniscus, a tear of the anterior cruciate ligament, diffuse degeneration, and diffuse synovitis of the left knee. 

In March 2005, the Veteran received a custom knee brace due to the anterior cruciate ligament disorder and degenerative joint disease.

In November 2006, the Veteran's left knee was evaluated at the VAMC. The Veteran complained of constant left knee pain and swelling with activity; the pain was in the posterior lateral part of the knee. She reported being aware of locking as well as buckling on stair use. The Veteran could walk around the grocery store without difficulty. Objective findings showed posterior tenderness, parapatellar edema, and positive results for crepitus and the Steinman's test. The McMurray's, Lachman's, and drawer test were all negative. Flexion was to 90 degrees with full extension. Strength was 5/5 with positive sensation and pulses. An X-ray showed lateral/medialfemoral compartment disease. The assessment was tricompartment disease. 

In November 2007, the Veteran's primary care provider noted that since her 2004 surgery, she continued to experience pain and decreased range of motion which required the use of a custom brace.

In June 2008, a MRI of the left knee demonstrated tricompartment osteoarthritis of the left knee and mild patellofemoral involvement. There also was moderately severe lateral compartment disease and severe medial compartment disease. 

In October 2008, a private orthopedic surgeon reported that the Veteran had been fairly active in the past but her knee pain now limited her activities and she is relatively sedentary. He stated the Veteran had now developed advanced medial compartment osteoarthritis and recommended a unicompartment arthroplasty. She is able to do grocery shopping but by the time she is done, she has enough knee pain that she has no interest in further activities and goes home. Recently, the Veteran fell at home in the kitchen because of the left knee, landed on the left knee, and then broke several ribs. Secondary to this she developed a pneumothorax. At best, she could walk 3/4 to 3/8 of a mile. The Veteran had a range of motion from 0 to about 95 degrees. 

In September 2009, the Veteran's knee flexion was 90 degrees and full extension. The left knee joint line was tender bilaterally and there was minimal peripatellar swelling. There also was crepitus and significant quadriceps atrophy. Her knee strength and sensation was normal. 

The Veteran testified in December 2009 that she had to wear a knee brace to keep herself balanced or stable and due to her knee giving way. She could do steps but preferred not to because it was chore whether going up or down. It also limited her ability to walk long distances. 

In January 2010, her primary care provider wrote a letter addressed to VA comparing her various disabilities to her job description. One requirement for her job required travel out of state, but due to severe degeneration of the left knee, she was unable to walk long distance which inhibited her ability to travel. The provider also stated that sitting for extended periods of time such as in a car or on a plane or in a chair at a conference is unbearable. The Veteran is also unable to lift or carry any luggage. It is unclear if these limitations of function were due to the left knee or one or more of her other disabilities such as degenerative disc disease of the back.

In September 2010, an MRI revealed left knee tricompartment osteoarthritis and chondrosis accentuated in the posterior aspects of the medial and lateral joint compartments with effusion and 23-mm osseous intraarticular body along the popliteus muscle-tendon junction. The anterior cruciate ligament was deficient with anterior drawer sign. The radiologist found it difficult to assess but suspected the Veteran had medial and lateral meniscal tears. 

In November 2010, the Veteran had a total left knee arthroplasty due to severe degenerative osteoarthritis of the left knee with flexion contracture. 
After careful review of the evidence, the Board finds that the Veteran's left knee disability, arthritis, does not warrant a rating higher than 10 percent from July 26, 2005, to November 29, 2010. Although the Veteran attributed a fall that broke several ribs to her left knee and asserts that the knee was unstable during this period, at all relevant times, there has not been any objective or medical evidence demonstrating instability of the knee. 

The Board recognizes that the evidence supporting the Veteran's claim for a higher rating for her left knee disability includes her statements regarding the severity of her left knee symptoms particularly pain and her assertions of instability. The Board has considered the Veteran's lay statements that her disability is worse than currently evaluated. In evaluating a claim for an increased schedular disability rating, however, VA must consider the factors as enumerated in the rating criteria discussed above, which in part involves the examination of clinical data gathered by competent medical professionals. Massey v. Brown, 7 Vet. App. 204, 208 (1994). The Board is not free to ignore VA's duly promulgated regulations, which include the Rating Schedule. Franklin v. Brown, 5 Vet. App. 190, 193 (1993). The Board is bound by the law and is without authority to grant benefits on an equitable basis. See 38 U.S.C.A. §§ 503, 7104; Harvey v. Brown, 6 Vet. App. 416, 425 (1994).

Furthermore, in rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. See Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). 

Competency is a legal concept in determining whether lay or medical evidence may be considered, in other words, whether the evidence is admissible as distinguished from credibility and weight, factual determinations going to the probative value of the evidence, that is, does the evidence tend to prove a fact, once the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997).

In this case, the Veteran is competent to report symptoms because this requires only personal knowledge as it comes to her through her senses. Layno v. Brown, 6 Vet. App. 465, 469-71 (1994). She is not, however, competent to identify a specific level of disability of this disorder according to the appropriate diagnostic codes. That involves specialized knowledge or training in identifying injuries and diseases of the nerves and inguinal area. Competent medical evidence means evidence provided by a person who is qualified through education, training, or experience to offer a medical diagnosis, statement, or opinion. 38 C.F.R. § 3.159. No factual foundation has been established that the Veteran is otherwise qualified through specialized education, training, or experience to offer a medical diagnosis. 

Such competent evidence concerning the nature and extent of the Veteran's left knee disability has been provided by the medical personnel who have examined her during the current appeal period and who have rendered pertinent opinions in conjunction with the evaluations. The medical findings (as provided in the examination reports and the clinical records) directly address the criteria under which this disability is evaluated. As such, the Board finds these records to be more probative than the Veteran's subjective complaints of increased symptomatology. 

Accordingly, the Board finds that the Veteran is not entitled to an increased rating for instability under Diagnostic Code 5257.

The schedular criteria for a higher evaluation contemplate knee flexion limited to 30 degrees or less. Even with consideration of pain and repetitive use, as demonstrated on VA examinations, the left knee demonstrated at worst flexion limited to 90 degrees after repetition. Thus, the Board's finding applies even after considering functional loss due to pain, weakness, excess fatigability, swelling, deformity, atrophy, painful movement, and repetitive motion. See 38 C.F.R. §§ 4.40 , 4.45, 4.59.

While the Veteran did experience pain with flexion, the pain does not raise to the level of functional loss equating to flexion limited to 30 degrees. See Mitchell v. Shinseki, 25 Vet. App. 32, 43 (2011) (pain must affect some aspect of normal movement in order to constitute functional loss under 38 C.F.R. § 4.40). To this extent, the Board places greater weight on the objective findings of the VA examination, with consideration of pain, than the Veteran's subjective complaints.
Extension to 0 degrees in the left knee does not more nearly approximate or equate to extension limited to 10 degrees. Therefore, a 10 percent rating for limitation of extension under Diagnostic Code 5261 is not warranted. There is no indication there would be additional functional loss due to pain, weakness, excess fatigability, swelling, deformity, atrophy, or painful movement, and repetitive motion. 38 C.F.R. §§ 4.40 , 4.45, 4.59.

The Board notes that the Veteran has been diagnosed with and treatment for a tear in both the lateral and the medial meniscus. This resulted in a partial meniscectomy for each left meniscus in 2004 and therefore, it appears neither meniscus was entirely removed. Under Diagnostic Code 5259, a 10 percent rating is assigned for surgical removal of a semilunar cartilage that is symptomatic, the rating the Veteran is already receiving. If the meniscus was not removed, a rating under Diagnostic Code 5258 for dislocated semilunar cartilage allows for maximum rating of 20 percent. To the extent the tears have created symptoms that equate to symptomatic dislocated semilunar cartilage, Diagnostic Code 5258 rates the disability based upon pain, effusion, and locking. 

Either way, although the left knee appears to be symptomatic, there is no evidence of any symptoms are not already covered by Diagnostic Codes 5260, 5261, and 5257, and 38 C.F.R. § 4.59 (painful motion). To rate the same symptoms under Diagnostic Code 5258 or 5259 would violate the prohibition against pyramiding. Evaluation of the same disability under various diagnoses, known as pyramiding, is generally to be avoided. 38 C.F.R. § 4.14. The critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). To assess his meniscus knee disability with the orthopedic manifestations already evaluated by the degenerative joint disease rating and the instability rating would violate the rule against pyramiding. Cullen v. Shinseki, 24 Vet. App. 74 (2010) (within a particular diagnostic code, a claimant is not entitled to more than one disability rating for a single disability unless the regulation expressly provides otherwise). Stated another way, the Veteran's symptoms of painful motion, loss of motion, and other symptoms are rated under the other noted Diagnostic Codes and 38 C.F.R. § 4.59 and a separate rating for a symptomatic meniscus would be duplicative or overlapping the other ratings, which is not permissible under 38 C.F.R. § 4.14. 

In sum, throughout the rating period from July 26, 2005, to November 29, 2010, the criterion in excess of 10 percent for the left knee have not been met nor does the disability picture more nearly approximate the schedular criteria for a higher rating based on limitation of flexion under Diagnostic Code 5260. Further, there is no evidence in the record that establishes a limitation of extension of the left knee warranting a separate rating under Diagnostic Codes 5261 or a rating based upon instability under Diagnostic Code 5257. Finally, there is no evidence of other ratable pathology such as ankylosis, acquired or traumatic genu recurvatum, tibia and fibula impairment (malunion or nonunion) under Diagnostic Codes 5256, 5262, and 5263. The Board has thus considered the application of other diagnostic codes in order to afford the Veteran a higher rating but does not find any raised by the evidence. 

For reasons expressed, the current evaluations more accurately reflect the actual degree of impairment shown for the left knee for the period from July 26, 2005, to November 29, 2010, and there is no basis for staged ratings. In reaching the above conclusions, the Board has considered the applicability of the benefit of the doubt doctrine. The preponderance of the evidence, however, is against the claim for a rating higher than 10 percent for the right knee disability and that doctrine is not applicable in the instant appeal. See 38 U.S.C.A. § 5107(b).

After the Veteran's November 2010 surgery for a total left knee arthroplasty, she received physical therapy. The therapist noted the Veteran reported difficulty with range of motion, which the therapist recorded as (13)-90. By February 2011, the range of motion was 0 degrees to 113 degrees. The Veteran was feeling a lot better overall although she still complained of swelling in the knee and difficulty with full flexion and some functional activity. 

The Veteran underwent a VA examination in May 2011. The examiner did not review the claims file. In his interview with the Veteran, the Veteran had symptoms of pain, stiffness, weakness, and decreased speed of motion. The Veteran did not have symptoms of giving way, instability, incoordination, dislocation, subluxation, or locking episodes. Her symptoms were aggravated with prolonged walking, standing, sitting, and going up and down stairs. The Veteran was unable to walk more than a few yards. 

Upon examination, the Veteran had no crepitation, clicks or snaps, grinding, instability, or abnormalities of the patellar area or meniscus. As to the left knee arthroplasty, there was resulting moderate weakness. Her range of motion was 0 to 115 degrees with objective evidence of pain with active motion (flexion), although he did not record when the pain began and ended. There was no additional limitation after repetition. The examiner also noted that the Veteran was able to get on and off table without assistance, but did so carefully and slowly. 

The Board notes that the Veteran disputes the accuracy of this examination by specifically asserting that she did have symptoms of giving way, instability, incoordination, and locking episodes. The Veteran also asserted she had constitutional symptoms and incapacitating episodes of arthritis. She stated she was unable to walk long distances. She disagreed her left knee flexion was 115 degrees and indicated she had further limitation with repetition.

The Veteran received a second VA examination in August 2012. Flare-ups resulted from prolonged walking and standing and even without activity. This resulted in pain and swelling. Her flexion was to 70 degrees with pain at the 70 degree point. Her extension was limited to 15 degrees with pain at 15 degrees. After repetition, the range of motion was from 20 degrees to 70 degrees. The examiner concluded the functional loss after repetition was due to less movement than normal, weakened movement, pain, swelling, disturbance of locomotion, and interference with sitting, standing, or walking. Flexion strength was 4/5 and extension was 3/5. All stability tests (Lachman, posterior instability, valgus/vargus) were normal. The examiner also found no history of recurrent patellar subluxation/dislocation. The examiner stated that Veteran also did not currently have nor was there a history of shin splints or a meniscectomy, although the examiner later noted the 2004 surgery included a partial medial and lateral meniscectomy. The examiner determined that the arthroplasty residuals resulted in intermediate degree of residual weakness, pain, and limitation of motion as well as interference with sitting, standing, and weight-bearing. The surgery scar was 18.5 cm long and was not painful. 

Again, the Veteran disputes the accuracy of the examiner's report. She asserts that her functional limitations include excess fatigability, incoordination, deformity, atrophy of disuse, and instability of station. She also points out that contrary to the VA examiner's report, she had a history of shin splints as she was treated in service for this condition and that she had a meniscectomy in 2004 and she had residual signs from the procedure. The Veteran also asserts that the arthroplasty residuals are chronic residuals consisting of severe pain or weakness. She argues that it is chronic because it has been two years since the surgery and she still has swelling and painful motion. She also states that the scar is painful and interferes with the bending of the knee. 

A July 2014 X-ray showed the total knee arthroplasty to be well seated and there was no lucency around the components to suggest loosening or infection. There were however, new calcifications in the tibiofemoral joint space anteriorly, which the radiologist characterized as new free joint bodies on the left. 

In August 2014, the Veteran complained of bilateral knee pain, the left worse than the right and the left knee was also swollen. It was determined the total left knee arthroplasty needed revision due to instability.

In October 2014, the Veteran had a revision of her left knee arthroplasty. That same month, she had a VA examination focusing on her right knee but the examiner made some findings regarding the left knee as well. The examiner noted that the left knee was still swollen with steri-strips still on the incision line from the recent surgery. She had range of motion from 10 degrees extension to 75 degrees flexion with pain at the end points. The range did not change with repetition. The examiner noted weakened movement, excess fatigability, pain on movement, swelling and the left knee symptoms interfered with sitting. Due to the recent surgery, the examiner was unable to test for joint instability. As to the residuals of the meniscectomy, she had residuals of pain, swelling, and joint locking. 
In January 2015, the Veteran reported that her pre-operative pain was gone and the range of motion was improving. Upon examination her range of motion was 0-115 degrees. 

In March 2015, the left knee still looked swollen compared to the right. The range of motion was 0-115 degrees and there was no laxity. 

As noted, the Veteran has had two surgeries regarding her total left knee arthroplasty. In each instance, the Veteran received a temporary total disability rating for convalescence under 38 C.F.R. § 4.30. Therefore, the focus of the Board's analysis is on the period between the two surgeries and the period after the second surgery.

The Board also notes that the Veteran has disputed the accuracy of the VA examinations but as noted earlier, no factual foundation has been established that the Veteran is otherwise qualified through specialized education, training, or experience to offer a medical diagnosis. Such competent evidence concerning the nature and extent of the Veteran's left knee disability has been provided by the medical personnel who have examined her during the current appeal period and who have rendered pertinent opinions in conjunction with the evaluations. The medical findings (as provided in the examination reports and the clinical records) directly address the criteria under which this disability is evaluated. As such, the Board finds these records to be more probative than the Veteran's subjective complaints of increased symptomatology, whether she has certain objective signs such as instability or the extent she can flex her knee, or to dispute the accuracy of the examiner's findings. 

The Board is aware the Veteran feels her left knee has not been stable. At all relevant times, there has not been any medical evidence demonstrating instability of the knee. Accordingly, the Board finds that the Veteran is not entitled to an increased or separate rating for instability under Diagnostic Code 5257. Although laxity and loss of motion are separate and distinct disabilities that warrant separate rating, there is no laxity to warrant a separate rating. Esteban v. Brown, 6 Vet. App. 259, 261 (1994). The findings do not show that the Veteran has laxity in the left knee in addition to the rating awarded under Diagnostic Code 5262 in either period. (February 1, 2012 - October 6, 2014 or from December 1, 2015.

For the period February 1, 2012 to October 6, 2014, while the evidence does demonstrate a limitation for flexion, at worst flexion limited to 75 degrees, the Veteran is already rated at 30 percent, which is the maximum rating available under Diagnostic Code 5260 for limitation of flexion. 

Similarly, extension to 20 degrees in the left knee does not more nearly approximate or equate to extension limited to 30 degrees. Therefore, a 40 percent rating for limitation of extension or higher under Diagnostic Code 5261 is not warranted. There is no indication there would be additional functional loss of flexion or extension due to pain, weakness, excess fatigability, swelling, deformity, atrophy, or painful movement, and repetitive motion. 38 C.F.R. §§ 4.40 , 4.45, 4.59.

Diagnostic Code 5055, however, does provide a 60 percent rating if there are chronic residuals consisting of severe painful motion or weakness in the affected extremity. In this instance, for the period February 1, 2012 - October 6, 2014, the Board finds that the evidence demonstrates that the residuals for her left knee replacement caused intermediate degrees of residual weakness, pain, or limitation of motion. The Board recognizes that the Veteran reported in the May 2011 VA examination that she was unable to stand for more than a few minutes and unable to walk more than a few yards, but this examination occurred while in the period of convalescence from the first surgery and she received temporary total disability. Therefore, the Board finds the Veteran's report of symptoms and findings are not as probative as the evidence for the period starting in February 2012. 

The August 2012 VA examination demonstrated a range of motion, from 15 degrees to 70 degrees. Extension decreased to 20 degrees with repetition but flexion remained the same. The functional loss after repetition was due to less movement than normal, weakened movement, pain, swelling, disturbance of locomotion, and interference with sitting, standing, or walking. The examiner determined that the arthroplasty residuals resulted in intermediate degree of residual weakness, pain, or limitation of motion. Stability tests were normal. Up until the time it was determined she needed a revision for the left knee arthroplasty in 2014, there is no medical evidence suggesting her knee was worse than the results from the 2012 VA examination. 

Reconciling all of the medical evidence into a consistent disability picture, the Board finds that for the period of February 1, 2012 - October 6, 2014, the Veteran's disability caused no more than intermediate degrees of residual weakness, pain, or limitation of motion. As none of the Diagnostic Codes by analogy provide the Veteran with a higher rating, the Board finds that during this period, a rating no higher than 30 percent is warranted under Diagnostic Code 5055. 

In a similar manner, for the period after December 1, 2014, the Veteran's disability caused no more than intermediate degrees of residual weakness, pain, or limitation of motion. By January 2015, the Veteran reported her pain was gone and she had a range of motion from 0 degrees to 115 degrees with no evidence of laxity. As none of the Diagnostic Codes by analogy provide the Veteran with a higher rating, the Board finds that during this period, a rating no higher than 30 percent is warranted under Diagnostic Code 5055. 

Finally, there is no evidence of other ratable pathology such as meniscus impairment, acquired or traumatic genu recurvatum, tibia and fibula impairment (malunion or nonunion) under Diagnostic Codes 5258, 5259, 5262, and 5263. The Board has thus considered the application of other diagnostic codes in order to afford the Veteran a higher rating but does not find any raised by the evidence.

After a thorough review of the evidence, the Board finds that since the Veteran's initial knee replacement surgery and excluding the periods of convalescence, the left knee disability does not warrant a rating higher than 30 percent. 

The Board considered has the Veteran's competent testimony regarding severe left knee pain with increased activities or prolonged use; however, the limitations do not result in higher ratings based upon motion. The record reveals no evidence of additional limitation of motion due to pain, excess fatigability, weakness, incoordination or change in endurance that approximates the symptomatology contemplated by a rating in excess of 30 percent based on limitation of motion. Therefore, the Veteran's functional impairment of less movement than normal due to pain and fatigue is already contemplated in the current 30 percent rating. As such, the Board finds the Veteran does not demonstrate chronic residuals consisting of severe painful motion or weakness in the left knee that would warrant a 60 percent rating. Accordingly, a rating greater than 30 percent on this basis is not warranted 

Thus, the Board has considered whether there is any other schedular basis for granting higher rating for the left knee disability, but has found none. In addition, the Board has considered the doctrine of reasonable doubt but has determined that it is not applicable because the preponderance of the evidence is against a rating higher than 30 percent. 38 U.S.C.A. § 5107(b); 38 C.F.R. §§ 4.7, 4.21.

As the assigned evaluation reflects the actual degree of impairment shown since the date of the first left knee arthroplasty for the Veteran's the Veteran's left knee disability, there is no basis for staged ratings for this claim. 

The Board has considered the doctrine of reasonable doubt but has determined that it is not applicable because the preponderance of the evidence is against the claims. 38 U.S.C.A. § 5107(b) ; 38 C.F.R. §§ 4.7, 4.21.

Extraschedular Consideration 

Although the Board is precluded by regulation from assigning an extraschedular rating under 38 C.F.R. § 3.321(b)(1) in the first instance, the Board is not precluded from considering whether the case should be referred to the Director of VA's Compensation and Pension Service for a rating.

The threshold factor for extraschedular consideration is a finding that the evidence presents such an exceptional disability picture that the available schedular ratings for that service-connected disability are inadequate. This is accomplished by comparing the level of severity and symptomatology of the service-connected disability with the established criteria.
If the criteria reasonably describe the disability level and symptomatology, then the disability picture is contemplated by the Rating Schedule, and the assigned schedular rating is, therefore, adequate and referral for an extraschedular rating is not required. Thun v. Peake, 22 Vet. App. 111, 115 (2008), aff'd sub nom. Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009).

Musculoskeletal symptoms such as decreased range of motion, pain, stiffness, and weakness are clearly contemplated and provided for in the assigned ratings. The Board has considered the Veteran's lay statements and the medical evidence regarding her disability. The Veteran describes, as to those symptoms related to her left knee as decreased mobility, pain and weakness, and in the examinations and testimony, also reported her impairment in his quality of life. The Board has determined that such impairment of functioning is already encompassed in the rating criteria according to the diagnostic code for a radiculopathy injury or disability. Thus, as seen in the analysis above, the Board has considered these aspects of the Veteran's disabilities, and finds that the rating schedule adequately provides for ratings based on these symptoms or impairments. The Veteran also does not offer any explanation or argument to explain how the ratings assigned are inadequate to describe the symptoms and their effect upon his daily life. The evidence before the Board also does not establish any functional impairment that would not be covered or contemplated by the current schedular rating criteria.

Comparing the Veteran's current disability level and symptomatology to the Rating Schedule, the degree of disability is contemplated by the Rating Schedule and the assigned schedule ratings are, therefore, adequate and no referral to an extraschedular rating is required under 38 C.F.R. § 3.321(b)(1). 

In other words, the Board finds that the rating criteria reasonably describe the Veteran's disability and symptomatology, which is limitation of motion and pain, which is contemplated by the Rating Schedule under Diagnostic Codes 5257, 5260, and 5261, and the application of 38 C.F.R. §§ 4.40, 4.45, and the Veteran does not have any symptomatology not already contemplated by the Rating Schedule.

Finally, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. However, in this case, after applying the benefit of the doubt under of Mittleider v. West, 11 Vet. App. 181 (1998), there are no additional service-connected disabilities that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions.

Total Disability Rating for Compensation Based on Individual Unemployability

During the appeal period, the Veteran expressly raised a claim for total disability rating for compensation based on individual unemployability. See Rice v. Shinseki, 22 Vet. App. 447 (2009) (in a claim for increase, where the Veteran expressly raises a claim for a total disability rating on the basis of individual unemployability or the claim is reasonably raised by the record, the claim is not a separate claim, but a part of a claim for increase). The record reflects that TDIU has been granted in a January 2015 rating decision effective the last day the Veteran worked. Therefore, in the circumstances of this case, the Board does not need to discuss entitlement to TDIU.


ORDER

Entitlement to a rating in excess of 10 for percent from July 26, 2005, to November 29, 2010, for a left knee disability is denied. 


REMAND

In November 2013 and March 2015 substantive appeals, the Veteran requested a hearing before the Board on the issues of an increased rating for a lumbar spine disability, an increased rating for a mental health disability, and the propriety of a reduction in the rating for residuals of a hysterectomy.

The United States Court of Appeals for Veterans Claims has determined that a Veteran has a right to request a hearing before the issuance of a Board decision. See Bernard v. Brown, 4 Vet. App. 384, 393 (1993). Thus, the Veteran must be scheduled for the next available hearing at the RO before a VLJ from the Board in the order that the request have been received. See 38 C.F.R. §§ 20.700, 20.703, 20.704.

Accordingly, the case is REMANDED for the following action:

Schedule the Veteran for a hearing to be conducted at the RO before a Member of the Board and notify her of the scheduled hearing at the current address of record, in the order that the request was received. A copy of the notice provided to the Veteran and her attorney of the scheduled hearing should be placed in the record

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



____________________________________________
ROBERT C. SCHARNBERGER
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs